[Cite as *State v. Barnes*, 2016-Ohio-1168.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. Sheila G. Farmer, P.J. |
| Plaintiff-Appellee | Hon. W. Scott Gwin, J. |
| | Hon. William B. Hoffman, J. |
| -vs- | |
| | Case No. CT2015-0013 |
| DANIEL L. BARNES III. | |
| Defendant-Appellant | O P I N I O N |

| | |
|---|---|
| CHARACTER OF PROCEEDING: | Appeal from the Muskingum County Court of Common Pleas, Case No. CR2013-0199 |
| JUDGMENT: | Affirmed in part; Vacated in part and Remanded |
| DATE OF JUDGMENT ENTRY: | March 17, 2016 |

APPEARANCES:

| | |
|---|---|
| For Defendant-Appellant | For Plaintiff-Appellee |
| TONY A. CLYMER | D. MICHAEL HADDOX |
| 1420 Matthias Drive | Prosecuting Attorney |
| Columbus, Ohio 43224 | Muskingum County, Ohio |
| | By: GERALD V. ANDERSON II. |
| | Assistant Prosecuting Attorney |
| | 27 North Fifth St., P.O. Box 189 |
| | Zanesville, Ohio 43702-0189 |

*Hoffman, J.*

{¶1}   Defendant-appellant Daniel L. Barnes III appeals his convictions entered by the Muskingum County Court of Common Pleas on one count of aggravated robbery, with a gun specification; one count of felonious assault, with a gun specification; and one count of having weapons under disability. Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2}   On July 8, 2013, James Martin visited the Cozy Corner Bar with his friend, James Ricket, also known as "Hub."  While at the bar, Martin saw Appellant, Daniel Barnes III, and Eric Thornton, also known as "Louie" and "Fats" respectively. Appellant and Thornton asked Martin for a ride from the bar.

{¶3}   Upon arriving at a neighborhood in Zanesville, Martin testified Appellant asked him to drive around the city block one time.  Martin stated he drove around the block and returned to the same spot.  Upon parking, Martin felt his seat belt tighten and something, he believed to be a gun, at the back of his head.  He testified he then saw Appellant leaning up with his arm and putting a gun to the back of Ricket's head, telling him to "just chill."  He noted the gun was black, and had a beam on it.

{¶4}   Martin testified he threw his hands in the air, and told Appellant and Thornton they could have everything.  He stated he emptied his pockets on the armrest in the middle of the car.  Appellant and Thornton took everything, including cash monies. Appellant told Martin to pop the trunk of the car and to get inside of the trunk.  Martin testified he observed the trunk of the car had an emergency release, and after being ordered into the trunk at gun point, he waited until the car turned into the alley and then activated the emergency release.

{¶5} Martin escaped and took off running along Cliffwood Avenue. He ran onto a porch, banging on the door. Appellant caught up with him, and pointed the gun at Martin. A struggle ensued over the gun. Appellant engaged in a fight with Martin, inserting his fingers into Martin's eyeball socket and biting Martin.

{¶6} Appellant testified at trial on his own behalf. He maintains Martin drove to a neighborhood in Zanesville to pick up crack cocaine he intended to sell. Appellant testified Martin went into a crack house to purchase the crack. Appellant waited outside smoking a cigarette with the car door kicked open, when Martin returned. As Martin got back inside the car, he was angry and the car door jammed causing damage. Martin then got out of the car, cussing about the door and became upset. Ricket and Thornton also exited the vehicle during the incident. Ricket stepped on the side panel and onto the hood of the car, observing and watching.

{¶7} Appellant maintains a fight ensued, during which Martin's glasses were knocked off into the street. The fight lead to a chase ending on the front porch of Roberta Jones' residence. Appellant maintains he told Jones to call the police, using her name, as he was familiar with her from the past.

{¶8} Both Appellant and Martin testified a shot was fired on the porch of Roberta Jones. Appellant then hit Martin with the gun several times. Martin then ran from the porch to the police cruiser of Patrolman Chris Andrews. Patrolman Andrews testified at trial as to the incident, and the relation of the events as told to him by Martin in his cruiser.

{¶9} Patrolman Groves of the Zanesville Police Department testified he was responding to an assault with a handgun, when he observed a subject run between two houses. He and his K-9 officer responded, and chased the subject. His K-9 alerted to

something dropped by the subject, which turned out to be a Glock 23 handgun with a laser. The firearm was later tested and introduced into evidence as the firearm involved in the incident.

{¶10} As a result of the incident, Appellant was indicted on two counts of kidnapping, in violation of R.C. 2905.01(A)(2) and R.C. 2905.01(A)(3), felonies of the third degree; one count of aggravated robbery, in violation of R.C. 2911.01(A)(1), a felony of the first degree, with an attendant gun specification, in violation of R.C. 2941.145; one count of felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, with a gun specification under R.C. 2941.145; and one count of having a weapon under disability, in violation of R.C. 2929.13(A)(3), a felony of the third degree.

{¶11} Following a jury trial, Appellant was found guilty of the aggravated robbery charge, with a gun specification; felonious assault, with a gun specification; and having weapons under disability. Appellant was found not guilty of the kidnapping charges.

{¶12} A sentencing hearing was held on February 17, 2015. Appellant was sentenced to eleven years on the aggravated robbery charge, eight years on the felonious assault charge, thirty-six months on the having weapons under disability charge, and two three year mandatory sentences on the gun specifications.

{¶13} Appellant appeals, assigning as error:

{¶14} "I. THE GUILTY VERDICTS FOR AGGRAVATED ROBBERY WITH A FIREARM SPECIFICATION, FELONIOUS ASSAULT WITH A FIREARM SPECIFICATION AND HAVING A WEAPON WHILE UNDER DISABILITY AGAINST APPELLANT WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW.

{¶15} "II. THE APPELLANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL CONTRARY TO THE STATE AND FEDERAL CONSTITUTIONS.

{¶16} "III. THE TRIAL COURT ERRED IN ANSWERING A QUESTION FROM THE JURY DURING DELIBERATIONS WITHOUT THE PRESENCE OF APPELLANT THEREBY DEPRIVING HIM OF A FAIR TRIAL AS GUARANTEED BY THE STATE AND FEDERAL CONSTITUTIONS.

{¶17} "IV. THE TRIAL COURT VIOLATED APPELLANT'S STATE AND FEDERAL DOUBLE JEOPARDY PROTECTIONS, STATE AND FEDERAL RIGHTS TO DUE PROCESS, AND R.C. 2941.25 BY FAILING TO MERGE THE ALLIED OFFENSES OF AGGRAVATED ROBBERY AND FELONIOUS ASSAULT WHICH WERE BASED ON THE SAME ACT OF VIOLENCE.

{¶18} "V. THE TRIAL COURT PLAINLY ERRED IN IMPOSING MAXIMUM CONSECUTIVE SENTENCES FOR APPELLANT'S SEPARATE CONVICTIONS RENDERING THE SENTENCES CONTRARY TO LAW."

I.

{¶19} In the first assignment of error, Appellant maintains his convictions for aggravated robbery, with a gun specification; felonious assault, with a gun specification; and having weapons under disability, are against the manifest weight of the evidence and contrary to law.

{¶20} Manifest weight of the evidence claims concern the amount of evidence offered in support of one side of the case, and is a jury question. We must determine whether the jury, in interpreting the facts, so lost its way that its verdict results in a

manifest miscarriage of justice, *State v. Thompkins* (1997), 78 Ohio St.3d 387, citations deleted. On review for manifest weight, a reviewing court is "to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, syllabus 1.

{¶21} In *State v. Cobb*, Stark App. No. 2014CA00218, 2015-Ohio-3661, this Court held,

> A fundamental premise of our criminal trial system is that 'the *jury* is the lie detector.' *United States v. Barnard,* 490 F.2d 907, 912 (C.A.9 1973) (emphasis added), cert. denied, 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Determining the weight and credibility of witness testimony, therefore, has long been held to be the 'part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men.' *Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S .Ct. 720, 724–725, 35 L.Ed. 371 (1891)".

*United States v. Scheffer* (1997), 523 U.S. 303, 313, 118 S.Ct. 1261, 1266–1267.

The jury was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence". *State v. Craig* (Mar. 23, 2000), Franklin App. No. 99AP–739, citing *State v. Nivens* (May 28, 1996), Franklin App. No. 95APA09–1236 Indeed, the jurors need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver,* Franklin App. No. 02AP–604, 2003–Ohio–958, at ¶ 21, citing *State v. Antill* (1964), 176 Ohio St. 61, 67, 197 N.E.2d 548.; *State v. Burke,* Franklin App. No. 02AP1238, 2003–Ohio–2889, citing *State v. Caldwell* (1992), 79 Ohio App.3d 667, 607 N.E.2d 1096.

**{¶22}** Appellant was convicted of aggravated robbery, in violation of R.C. 2911.01(A)(1), which reads,

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

**{¶23}** Appellant was further convicted of felonious assault, in violation of R.C. 2903.11(A)(2), which reads,

(A) No person shall knowingly do either of the following:

***

(2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.

**{¶24}** Both the aggravated robbery and felonious assault charges carried attendant gun specifications, in violation of R.C. 2941.145, which reads,

(A) Imposition of a three-year mandatory prison term upon an offender under division (B)(1)(a) of section 2929.14 of the Revised Code is precluded unless the indictment, count in the indictment, or information charging the offense specifies that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense. The specification shall be stated at the end of the body of the indictment, count, or information, and shall be stated in substantially the following form:

"SPECIFICATION (or, SPECIFICATION TO THE FIRST COUNT). The Grand Jurors (or insert the person's or the prosecuting attorney's name when appropriate) further find and specify that (set forth that the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished

the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense)."

***

**{¶25}** Finally, Appellant was convicted of having weapons under disability, in violation of R.C. 2923.13(A)(3), which reads,

(A) Unless relieved from disability under operation of law or legal process, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

***

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

**{¶26}** At trial herein, James Martin, the alleged victim herein, testified,

Q. What happened when you got back?

A. As I stopped to let them out, and I believe put the car in park and was telling them bye or whatever, as I did that I felt my seat belt tighten and I felt a - - something come to the back of my head. And I looked over. And at that same time I seen Mr. Barnes leaning up with his arm and putting a gun to the back of Hub's [Ricket's] head, was telling him to just chill.

Q. Okay. Now, you felt something to your head?

A. Uh-huh.

Q. What did you believe was to your head?

A. It was a gun.

Q. Okay.   And then you saw Mr. Barnes with a gun.  What did the gun look like?

A. It was black.  Had a beam on it.

Q. Okay. When you say a beam, what do you mean a beam?

A. A laser site.

Q. Okay.  Was it a revolver-type gun, or semi-automatic-type gun?

A. Semi-automatic.

Q. Okay.  And he said be easy?

A. Be easy, just chill.

Q. Okay.  At some point did he- - did you end up giving him some of your property?

A. Yeah.  Yeah.

Q. Can you explain to the ladies and gentlemen how that came about.

A. Well, when he said be easy he was more or less saying just chill, it's a robbery, don't do anything stupid.  And, you know, I just throw my hands up and say, you know, it's good, you can have everything, you can have whatever.  And I just emptied by pockets and that was about it, put everything in the middle of the car.

Q. When you said you were putting it in the middle of the car, where was - -

A. Just on the - - the armrest, just right there in the middle.

Q. And as you - -

A. Just laid it on top of it.

Q. I'm sorry.  Continue.

A. I just laid it on top of the armrest right there.

Q. As you set the property there on the armrest what happened to it?

A. He started reaching for it, grabbing it, and that was it.

* * *

A. I waited for him to take off - - for the car to start moving and I kind of waited for him to make that turn out of the alley before I popped it.  And I popped the trunk and I got out and took off running.

Q. Okay.  And if you were looking at State's Exhibit A2 again there in front of you, which direction did you run?

A. I ran toward Cliffwood, towards the - - I got out right here and I ran over towards Cliffwood, which is up there.

* * *

Q. Okay.  Did you get up?

A. I got up and ran up on a porch to a door and banged on the door. And by this time when I turned around Mr. Barnes was right - - running up on the porch right behind me with the gun pointed at me.  And as he came up on the porch, just grabbed the gun, and there was - - we were struggling

over the gun, fighting for the gun, and I'm trying to keep it from him. And after a minute we're fighting and he's got his fingers halfway in my eyeball socket, just - - just all the way in there, and he's - - I'm - - still got ahold of the gun. So then he bites me. And I don't - - as he bit me I went to bite his arm, too, but he let go as soon as I went to bite him. And then we're still just struggling over the gun fighting.

Whoever's house, porch we were on, opened the door and closed it immediately. And so, we're still fighting over the gun, and the gun goes off. And it got my hand, from where my gun (sic.) was on top of the gun, cut my hand up. And we're still fightin' over the gun. He finally get the gun and then starts hit - - he hit me with the gun a few times then proceeds to grab me and try to drag me back out into the street and back up towards where my car was parked originally. I'm telling him I can't see, my eyes are messed up. He says, F your eyes and all this and then hits me again with the gun. I fall. I like get my balance and then I take off running again. But by this time we had heard police sirens coming, so I ran around the building. But as soon as I got around the building to the other side I seen the police car coming down the hill and I came between the houses and the officer got out and seen me and started maybe to draw on me, but I just told him open your back door, just open your back door. He opens the back door and I sat down and I couldn't breathe, was throwing up profusely and all that. And then I believe I passed out after that.

Q. Okay.

A. I woke up and the ambulance was there.

Tr. at 158-164.

{¶27} James Ricket, Martin's passenger, also known as "Hubs," testified on direct examination,

Q. Okay. What happened then after the car stopped?

A. That's when there was - - there was words exchanged between Louie [Barnes] and Jimmy [Martin].

Q. Okay.

A. Something about - - I can't quite remember what it was about. It was something about something bad happening, and he - - what - - he - - something about he owed him some money or something. I can't remember for what or why, but it was something about some money. And Jimmy [Martin] was denying it. And then at that point then that's when he said to give me - - that's when he told him to give me his money, get out the car.

Q. Okay.

A. I don't know what the - - what - - what the conversation was about or why he said something bad would - - had happened before, but something happened and they was - - had got into a little confrontation, and that's when Louie [Barnes] told him give him his money, get out the car.

Tr. at 199-200.

{¶28} Roberta Jones, whose front porch the altercation ensued upon, testified on direct examination at trial as to the events of the evening as she witnessed them. She testified she heard one of the individuals call her out by name, and say, "June, call the

police." Tr. at 217. However, she acknowledged she did not know the individuals involved in the fight, and had no idea how they knew her. Tr. at 218.

{¶29} Appellant then testified at trial as to the incident. He stated the fight stemmed from Appellant's anger over damage caused to his car door. He testified he, Thornton and Ricket got out of the car after Martin returned from buying crack at a crack house, and was angry over damage to the car door. An argument ensued during which Martin spit in Appellant's face, and they "squared up" in the street. Martin's glasses were knocked off into the street as a result. Appellant testified,

A. He start reaching in his pants pocket.

Q. Okay.

A. He start reaching in the middle of his pants.

Q. Were you concerned at that point?

A. Yes.

Q. Why?

A. Because I knew what he had.

Q. What did he have?

A. He had a semi-automatic handgun.

Q. Okay. What did he do with his hand at that point?

A. He didn't - - he- - he- - by the time he put it in his pants and he was coming out I grabbed his wrist so fast - - that it was just a natural reaction - - I grabbed his wrist like with a death grip, and as I'm grabbing his wrist I'm running him back and I run him into the door.

Q. Okay. So you - - this is now leaving the street?

A. Yeah. We're up like on that entryway going into that residence. We're on - - we're on that sidewalk.

Q. Okay.

A. We're a few feet away from the door by then.

Q. Okay.

A. But it - - but before I ran - - like we was scuffling a little bit before we got to that door. We was scuffling like in the yard. I remember we both was kind of like on our knees on the bushes right in front, right by the side of the car.

Q. Uh- - huh.

A. And when we both got up to our - - I used my weight, my momentum, and ran him into the door. And my back was to the door. And as we're scuffling Ms. Jones open her door.

Q. And she testified that one of those men called her out by name?

A. Yes. That was me.

Q. Okay. How did you know June Jones?

A. I've known Ms. June since 2000. I stayed right next door to her daughter. Her daughter was Crystal Jones, was in the back seat of the courtroom the other - - when she testified, with my fiancé. And - -

Q. Okay.

A. - - and I know Sierra Jones. That's Ms. June's daughter's daughter, which is Ms. June's granddaughter.

Q. Does she have a nickname?

A. Yeah, Nicky. We called her barefoot Nicky because she never really wore shoes.

Q. Okay. So you've known Ms. Jones for a long time?

A. For a long period. A long time.

Tr. at 479-488.

{¶30} Patrolman Chris Andrews testified on direct examination he was on patrol on the night of June 8, 2013, when a call came in of a fight between two males. Patrolman Andrews testified he responded to the call, and as he approached the area a male, later identified as James Martin, approached his cruiser and opened the back door to let himself in. He told Patrolman Andrews to "get him out of here, that somebody was out to kill him." Tr. at 227. Patrolman Andrews testified Martin was distraught, "throwing up" and "scared." He told Patrolman Andrews he had been robbed by "Fats [Thornton] and Louie [Barnes]." Patrolman Andrews recounted Martin's description of the events,

Q. Okay. What - - what did he say next?

A. I then had - - had him identify Fats [Thornton] and Louie [Barnes]. He identified Fats as being Eric Thornton and Louie being Daniel Barnes. I then asked him what had happened. He then - - once again, me talking to him as he's throwing up, shaking, and very upset, he advised me that earlier in the night he had been at the Cozy Corner. He told me that him and his friend, James Ricket, had been at the Cozy Corner and that Eric Thornton and Daniel Barnes had approached him about getting a ride to an address on Matthews Street.

* * *

A. He then - - James Martin then gave Eric Thornton and Daniel Barnes, along with James Ricket, a ride to an address on Matthews Street. James told me that he didn't know the address, was just giving a ride. James was in the driver seat, James Martin. The front seat passenger was James Ricket. Behind James Ricket, in the passenger side back, was Daniel Barnes, and behind James Martin was Eric Thornton.

* * *

A. He advised that as they pulled onto Matthews Street he was advised to stop the car, and it was at this time that Daniel Barnes and Eric Thornton then pulled guns on them - - being Eric Martin and - - correction, James Martin and James Ricket - - advising them to empty their pockets and robbed them.

Martin did advise me that he was then ordered out of the car by Eric Thornton, advised to empty his pockets, and then gave him approximately three to $400. After giving Thornton his money he was then ordered into the trunk of the car. Martin then told me that after he was in the trunk of the car the trunk was shut and that he then felt the car start to move. As he felt the car start to move forward a little bit he then hit the release button getting out of the vehicle.

* * *

A. Martin then advised me that he then started running towards Cliffwood, through this little wooded area here. He advised me that Daniel Barnes then took off running after him and caught up to him in front of the

residence that he later identified as being 607 Cliffwood. He told me that Barnes then had a gun on him. They then started fighting and struggling over the gun. As they were fighting and struggling over the gun they were on the front porch to the residence at 607 Cliffwood Avenue.

James told me that he then got somewhat of a control over the gun and that the gun went off once. And then after they kept struggling and fighting on the porch, that Daniel Barnes then got control over the gun then ordering him back into the woods behind 607. So in between ordering him into this wooded area back here.

Martin told me that as he was walking back with Barnes, as he was being held at gunpoint back to the woods, that he then broke free from Mr. Barnes, coming and flagging me down in my patrol car.

Tr. at 228-231.

{¶31} Upon review of the evidence, we find there was competent, credible evidence offered at trial to establish Appellant engaged in a theft offense, and while committing the offense had a deadly weapon. Appellant then chased Martin on foot and engaged in a fight which resulted in Appellant physically injuring Martin, while in possession of and with the use of a firearm. The weighing of the evidence and judging the credibility of the witnesses rests within the sound discretion of the trier of fact. Accordingly, we do not find Appellant's convictions were against the manifest weight of the evidence.

{¶32} The first assignment of error is overruled.

II.

{¶33} In the second assignment of error, Appellant argues he was denied the effective assistance of trial counsel.

{¶34} The standard for reviewing claims for ineffective assistance of counsel was set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984). Ohio adopted this standard in the case of *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373(1989). These cases require a two-pronged analysis in reviewing a claim for ineffective assistance of counsel.

{¶35} First, we must determine whether counsel's assistance was ineffective; i.e., whether counsel's performance fell below an objective standard of reasonable representation and violates any of his essential duties to the client. If we find ineffective assistance of counsel, we must then determine whether the defense was actually prejudiced by counsel's ineffectiveness such that the reliability of the outcome of the trial is suspect. This requires a showing there is a reasonable probability but for counsel's unprofessional error, the outcome of the trial would have been different. We apply the *Strickland* test to all claims of ineffective assistance of counsel, either trial counsel, or appellate counsel. *State v. Blacker,* 5th Dist. No.2005–CA–41, 2006–Ohio–5214.

{¶36} A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Bradley* at 143, quoting *Strickland* at 697.

{¶37} Appellant maintains his trial counsel was ineffective in failing to object to witness testimony presented at trial. Appellant cites the testimony offered by James Ricket on cross-examination. Specifically, Appellant argues the State's questioning was

leading and beyond the scope of direct examination. During the testimony, Ricket testifies he heard Appellant demand "stuff" from Martin, and then Appellant took it. Tr. at 213. However, upon review of the transcript cited supra in our analysis and disposition of the first assignment of error, Ricket had testified on direct examination there were words exchanged between Appellant and Martin, and Appellant had told Martin to give him his money and to get out of the car. Tr. at 200. Therefore, the testimony elicited on cross-examination by the State was not beyond the scope of direct examination. We do not find trial counsel was ineffective for failing to object to the testimony. Further, Appellant has not demonstrated prejudice as a result of any alleged error.

{¶38} Appellant further cites testimony offered by Patrolman Andrews as to events Martin had told him, which should have been objected to as hearsay. Appellant maintains the testimony of the law enforcement officer bolstered allegations made by Martin.

{¶39} Patrolman Andrews testified at trial as to Martin opening the door of his cruiser and relating the incident to him. The evidence was not offered for the truth of the matter asserted, but rather as cumulative evidence to the testimony offered by Martin and Ricket previously as cited above. Therefore, Appellant has not demonstrated prejudice as a result of the testimony.

{¶40} In addition, Appellant maintains his trial counsel failed to object to testimony offered by Patrolman Groves regarding statements made by Patrolman Andrews, which he asserts also constituted hearsay. Patrolman Groves testified Patrolman Andrews radioed him and informed him the subject who assaulted Martin was Appellant.

{¶41} Upon review of the record, and as set forth above, Patrolman Groves testified he responded to a call of an assault with a handgun with his K-9 officer. He

observed a suspect run between two houses, and exited his vehicle to chase on foot, following the human scent. His K-9 alerted to something dropped by the suspect, which later was identified as a Glock 23 handgun with a laser.  Patrolman Andrews testified Martin was on foot, and entered his cruiser.  Martin told him he had been robbed by Appellant and assaulted.  Andrews reported the incident to Groves.

**{¶42}** We find the information was not offered for the truth of the matter asserted but offered to demonstrate the reasoning as to why Patrolman Groves chased a suspect. Moreover, the information was cumulative to the testimony of Martin who testified at trial he told Patrolman Andrews he had been assaulted by Appellant.  Therefore, Appellant has not demonstrated, but for the alleged error, the outcome of the trial would have been otherwise, pursuant to the second prong of *Strickland.*

**{¶43}** In addition, Appellant notes his counsel elected not to cross-examine George Guy, a witness at trial, despite the discrepancy in his testimony as to the time of day.  Appellant argues his counsel could have shown the jury Guy could not have seen Appellant get out of the car after the alleged incident since the incident occurred two hours after Guy testified the two persons exited the vehicle.

**{¶44}** Upon review of Guy's testimony, he testified he was walking his dog and observed two males exit the vehicle, one with braids. He testified it was around eleven in the evening, as when he returned the news was coming on.  He called 9-1-1.  Patrolman Barnhart responded to the call, and testified at trial.

**{¶45}** Upon review of the entire record, we find Appellant has not demonstrated, but for any presumed error, the outcome of the trial would have been otherwise. Therefore, Appellant has not met the second prong of *Strickland.*

**{¶46}** Further, Appellant maintains his counsel failed to object to speculative testimony offered by Detective Moore regarding how the damage occurred to Martin's vehicle. Martin testified the door could have been pushed too far in one direction. Tr. at 322-323. Appellant maintains hearing the testimony from a law enforcement official on behalf of the State permitted the jury to lend truth and value to the testimony.

**{¶47}** Appellant has not demonstrated but for the alleged error, the outcome of the trial would have been otherwise. Damage to the car door was not an issue at trial, and both parties stipulated a fight took place between them. Appellant has not demonstrated prejudice as a result of the testimony and therefore has not satisfied the second prong of *Strickland*.

**{¶48}** Appellant also argues his trial counsel erred in not requesting a jury instruction on the lesser included offenses of assault and theft. We find Appellant has not demonstrated ineffective assistance of counsel in not requesting the lesser included offenses because Appellant completely denied not only having a firearm but also completely denied committing any theft offense. Therefore, we find it was a tactical decision of trial counsel to pursue an outright acquittal on the charges rather than attempting to mitigate the seriousness of the offenses.

**{¶49}** As to the failure to request the instructions, a trial court must give all instructions which are relevant and necessary for the jury to weigh evidence and discharge its duty as the trier of fact. *State v. Comen*, 50 Ohio St.3d 206 (1990). Even though an offense may be statutorily defined as a lesser-included offense of another, a charge on such a lesser-included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction

upon the lesser-included offense. *State v. Thomas,* 40 Ohio St.3d 213 (1988). The court must view the evidence in a light most favorable to the defendant. *State v. Smith,* 89 Ohio St. 3d 323 (2000).

**{¶50}** Nevertheless, an instruction is not warranted every time any evidence is presented on a lesser-included offense. There must be sufficient evidence to allow a jury to reasonably reject the greater-offense and find the defendant guilty on the lesser-included offense. *State v. Conway,* 108 Ohio St.3d 240, 2006-Ohio-791.

**{¶51}** Here, had the jury accepted Appellant's presentation of the facts stating Martin engaged him in a fight over damage to the car door, during which neither he, nor Martin, possessed a firearm,[1] the jury would not have convicted Appellant on the lesser-included offenses of theft or assault. We do not find trial counsel ineffective in failing to request the instructions on the lesser-included offenses of theft and assault.

**{¶52}** Appellant also maintains the trial court's instruction to the jury following the jury's question as to whether or not they could have a transcript of the recorded interview of Appellant by Detective Hill was prejudicial error. Specifically, the trial court instructed the jury they must rely on their collective memories, and the court instructed the jury without Appellant being present in the courtroom.

**{¶53}** Pursuant to our analysis and discussion of Appellant's fourth assignment of error, we find counsel's failure to object error, but harmless error. Appellant had a right to be present in the courtroom, but the trial court's instruction to the jury was not substantive; therefore, Appellant was not prejudiced by the trial court's instruction.

---

[1] Appellant initially denied either he or Martin possessed a firearm during the incident. Appellant only upon subsequent questioning by law enforcement officers admitted to a firearm being present and stated Martin possessed/owned the firearm.

{¶54} Finally, Appellant maintains trial counsel failed to offer witnesses at trial to corroborate the testimony as to how Appellant knew Roberta Jones. Appellant testified on direct examination he knew June Jones as he stayed right next door to her daughter. Tr. at 488. He testified he knew her granddaughter also. Tr. at 488. He testified he knew Ms. Jones for a "long period" and she's elderly. Tr. at 488. Appellant introduced testimony as to his knowledge and familiarity with Ms. Jones at trial. Any witnesses offered to corroborate his testimony would merely be cumulative.

{¶55} Further, we find any presumed error on behalf of trial counsel would be harmless error. Appellant has not demonstrated but for the alleged error, the outcome of the trial would have been otherwise. Appellant was able to offer evidence of his relationship and knowledge of Ms. Jones at trial through his own testimony and the jury could consider the information.

{¶56} The second assignment of error is overruled.

III.

{¶57} In the third assignment of error, Appellant maintains the trial court erred in answering a question from the jury without the presence of Appellant.

{¶58} During deliberations, the jury questioned the trial court as to whether they could review a transcript of the recorded interview of Appellant by Detective Hill. The record reflects:

> Thereupon, the jury had a question at 4:42 p.m. and the following occurs outside their presence.
>
> - - -

THE COURT: We would like to request a transcript from Detective Hill and Mr. Barnes' interview.

Answer: You must rely upon your collective memories as to what the evidence was or was not.

MR. SAMS: Yep, I agree.

MR. LITLE: (Nods affirmatively.)  Sounds fine with me.

Tr. at 605.

{¶59} The Ohio Supreme Court has held that a communication concerning instructions between the judge and jury without the presence of the defendant or his counsel does not constitute grounds for reversal where the defendant's right to a fair trial was not prejudiced by the communication and the error was harmless beyond a reasonable doubt. See *State v. Abrams* (1974), 39 Ohio St.2d 53, 313 N.E.2d 823. If the communication is not "substantive," the error is harmless. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 236–237, 473 N.E.2d 264. In *Bostic v. Connor* (1988), 37 Ohio St.3d 144, 150, 524 N.E.2d 881, the court held that the trial court's ex parte communication with the jury was harmless error because there was no "possibility that the jury's conclusion was influenced by the court's reply."

{¶60} Here, the trial court instructed the jury they would have to rely on their collective memories regarding the interview Detective Hill conducted of Appellant. We find, the trial court's instruction to the jury was not substantive, and there was no possibility the jury's conclusion was influenced by the court's reply.  Therefore, any presumed error was harmless beyond a reasonable doubt.

{¶61} The third assignment of error is overruled.

IV.

{¶62} In the fourth assignment of error, Appellant maintains the trial court erred in failing to merge the allied offenses of aggravated robbery and felonious assault which were based on the same offense of violence.

{¶63} R.C. 2941.25 sets forth,

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

{¶64} The Ohio Supreme Court, in *State v. Johnson,* 128 Ohio St.3d 1405, 2010–Ohio–6314, modified the test for determining whether offenses are allied offenses of similar import. In *Johnson,* the Ohio Supreme Court directed us to look at the elements of the offenses in question and determine whether or not it is possible to commit one offense and commit the other with the same conduct. If the answer to such question is in the affirmative, the court must then determine whether or not the offenses were committed by the same conduct. If the answer to the above two questions is yes, then the offenses are allied offenses of similar import and will be merged. If, however, the court determines that commission of one offense will never result in the commission of the other, or if there

is a separate animus for each offense, then the offenses will not merge according to *Johnson,* supra.

**{¶65}** More recently, in *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, the Ohio Supreme Court held,

> When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. R.C. 2941.25(B).

> A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed? If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus or motivation.

> At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct. The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes

more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense. We therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

{¶66} As set forth above, Appellant was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), and felonious assault, in violation of R.C. 2903.11(A)(2).

{¶67} The evidence demonstrates Appellant committed aggravated robbery when he held a gun to Martin's head in the vehicle, demanding he give him money. He then took the money, and ordered Martin out of the vehicle and into the trunk of the car. By then, the aggravated robbery was completed.

{¶68} Appellant started driving in the car with Martin inside the trunk of the vehicle. Martin then used the release mechanism in the trunk of the car to escape, and was chased on foot by Appellant. An altercation ensued on the front porch of Ms. Jones' residence, during which Appellant physically harmed Martin, with the use of the firearm. We find this separate conduct constitutes the charge of felonious assault.

{¶69} Accordingly, we find the trial court did not err in finding the charges herein were not allied offenses as the offenses were committed with separate conduct.

{¶70} The fourth assignment of error is overruled.

V.

**{¶71}** In the fifth assigned error, Appellant maintains the trial court erred in imposing maximum, consecutive sentences for Appellant's separate convictions; thereby, rendering the sentences contrary to law. Specifically, Appellant asserts the trial court did not consider the purposes and principles of sentencing required by R.C. 2929.11 and R.C. 2929.12 and did not make the required findings necessary to support consecutive sentences under R.C. 2929.14.

**{¶72}** O.R.C. 2929.14(C) reads,

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to Section 2929.16, 2929.17 or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) The harm caused by the multiple offenses was so great or unusual that no single prison terms for any of the offenses committed as part of a single course of conduct adequately reflects' the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶73}** This Court recently addressed the requirements necessary to impose consecutive sentences in *State v. Williams,* Stark App. No.2013CA00189, 2013–Ohio–3448,

In 2003, the Ohio Supreme Court held in *State v. Comer,* 99 Ohio St.3d 463, 2003–Ohio–4165, a court may not impose consecutive sentences unless it 'finds' three statutory factors enumerated in then 2929.14(E)(4). The statutory factors were the same as those now enumerated in the revised version of R.C. 2929.14(C)(4) following enactment of H.B. 86. The revised version of the statute again requires the trial court to "find" the factors enumerated.

The Court in *Comer, supra,* read R.C. 2929.14(E)(4), as it existed then, in conjunction with then R.C. 2929.19(B), to reach its conclusion the trial court must also state its reasons for the sentence imposed. Then R.C. 2929.19(B) stated the trial court 'shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed in any of the following circumstances ... (c) if it imposes consecutive sentences under R.C. 2929.14.'

2011 Am.Sub.H.B. No. 86, which became effective on September 30, 2011, revived the language provided in former R.C. 2929.14(E) and moved it to R.C. 2929.14(C)(4). The revisions to the felony sentencing

statutes under 2011 Am.Sub.H.B. No. 86 now require a trial court to make specific findings when imposing consecutive sentences.

The trial court must therefore make the required findings in compliance with *State v. Comer,* 99 Ohio St.3d 463, 2003–Ohio–4165. We have consistently stated the record must clearly demonstrate consecutive sentences are not only appropriate, but are also clearly supported by the record. See, *State v. Fauntleroy,* 5th Dist. No. CT2012–0001, 2012–Ohio–4955; *State v. Bonnell,* 5th Dist. No. 12CAA3022, 2012–Ohio–515.

In other words, in reviewing the record we must be convinced the trial court imposed consecutive sentences because it had found consecutive sentences were necessary to protect the public or to punish the offender, they are not disproportionate to the seriousness of his conduct and the danger the offender poses to the public. In addition, in reviewing the record we must be convinced that the trial court found the offender's history of criminal conduct demonstrated consecutive sentences were necessary to protect the public from future crime, or the offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense, or at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the

courses of conduct adequately reflects the seriousness of the offender's conduct. R.C. 2929.14(C)(4).

**{¶74}** At sentencing herein, the trial court stated,

Therefore, the Court will impose, in regards to the felony of the first degree, a 11 year mandatory prison sentence. In regards to felony of the second degree, the Court will impose an 8 year mandatory prison sentence. In regards to felony of the third degree, the Court will impose a 36 month sentence.

The Court will order that all those sentences be served consecutively and consecutively to the sentence you're currently serving.

\*\*\*

THE COURT: There is one thing I need to do which I set out to do and did not do. In order be given consecutive sentences, the Court must abide by the Ohio Revised Code that deals with that, and that section would be Section 2929.14.

And it states if multiple prison terms are imposed on an offender for convictions on multiple offenses, the Court may require the offender to serve the prison term consecutively if the Court find that the consecutive service is necessary to protect the public from future crime or to punish the offender and the consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and the offender either committed one or more of the multiple

offenses while the offender was awaiting trial or sentencing or under a sanction imposed by post-release control. That does not apply.

At least two of the multiple offenses were committed as part of one or more courses of conduct and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct. That does apply.

The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crimes by the offender.

As I indicated before in regards to your prior criminal history, it's – the Court requires that the consecutive sentences are necessary because of your history of committing these type of offenses and the propensity to continue to commit such offenses and the propensity to continue to conduct is so serious that these multiple - - the consecutive sentences are necessary to protect the public.

Tr. at 13; 19-20.

**{¶75}** Here, the trial court's February 20, 2015 Judgment Entry of sentence reads,

The Court made judicial findings that the Defendant has previous felony convictions, including a prior felony of the first degree; and a felony of the second degree. Therefore, pursuant to O.R.C. §2929.13(F)(6), the Court finds that sentences in regard to Counts One and Four in the within

case are mandatory sentences. Further pursuant to O.R.C. §2929.14, the Court finds that the imposition of consecutive sentences herein are necessary to protect the public from future crimes.

{¶76} Upon review of the record, we do not find the trial court made all the requisite findings necessary to support the imposition of consecutive sentences either during sentencing or in its sentencing entry.[2]

{¶77} Appellant's fifth assignment of error is sustained.

{¶78} Appellant's sentence in the Muskingum County Court of Common Pleas is therefore vacated, and the matter remanded for resentencing.

By: Hoffman, J.

Gwin, J. concurs,

Farmer, P.J., dissents

---

[2] Notably missing is any finding consecutive sentences are not disproportionate to the seriousness of the offender's conduct and the danger the offender poses to the public.

*Farmer, P.J., dissents*

**{¶79}** I respectfully dissent from the majority opinion on the sentencing issue under Assignment of Error V.

**{¶80}** The majority finds the trial court did not meet the requirements of R.C. 2929.14(C), specifically, "missing is any finding consecutive sentences are not disproportionate to the seriousness of the offender's conduct and the danger the offender poses to the public." Fn. 1.

**{¶81}** In *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, ¶ 29, the Supreme Court of Ohio explained the following regarding R.C. 2929.14(C): "a word-for-word recitation of the language of the statute is not required, and as long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld."

**{¶82}** As noted by the majority in ¶ 74, during the sentencing hearing, the trial court found the harm caused by the crimes "was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct." The trial court also noted appellant's prior criminal history and his propensity to continue to commit such offenses and in conduct "so serious" that "consecutive sentences are necessary to protect the public."

**{¶83}** In *State v. Santiago,* 8th Dist. Cuyahoga No. 102280, 2015-Ohio-4073, our brethren from the Eighth District reviewed a consecutive sentence and concluded as the majority sub judice. In a dissenting opinion, Judge Gallagher stated at ¶ 14: "If no single term adequately reflects the seriousness of the offender's conduct, then, logically, the

consecutive service of prison sentences is not disproportionate to the offender's conduct." I concur with this statement.

**{¶84}** While the trial court did not use a "talismanic incantation of the words of the statute," I find it can be discerned from the record that the trial court engaged in a proper analysis under R.C. 2929.14(C). *Bonnell* at ¶ 37.

**{¶85}** I would deny the assignment of error.